**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| BABATUNDE AJAYI,  a.k.a. Tunde Ajayi, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:20-cv-00035-RJC |
| | ) | |
| RICE ENERGY a.k.a. EQT RE LLC, a.k.a. | ) | |
| RICE MIDSTREAM MANAGEMENT LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>OPINION</u>

Robert J. Colville, United States District Judge.

Presently before the Court is a Partial Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) filed on behalf of defendant EQT Production Company (hereinafter "Rice").[1]  (ECF No. 15). Rice moves to dismiss Counts I through IX and Count XI of the Amended Complaint.  For the reasons stated herein, the motion will be granted.

## I.  Background and Factual Allegations

This action is brought by Babatunde "Tunde" Ajayi ("Plaintiff"), previously employed by Rice, as a result of his employment termination in 2016 which caused him to lose his nearly-vested stock in Rice valued at $1,954,525.   The action was removed from the Court of Common Pleas of Washington County, Pennsylvania on January 8, 2020.  On January 22, 2020, Rice filed a Partial Motion to Dismiss (ECF No. 6), and on February 12, 2020, Plaintiff filed the First Amended Complaint ("FAC") (ECF No. 11), and thus the first Motion to Dismiss was

---

[1] Rice Energy, which was Rice Energy Inc., is now EQT RE LLC. Additionally, the caption also identifies "a.k.a Rice Midstream Management, LLC", but that is a separate entity from EQT RE LLC. Rice Midstream Management LLC changed its name to EQM Midstream Management LLC.

terminated as moot.  (ECF No. 12).  On March 10, 2020, Rice filed the now-pending Partial

Motion to Dismiss the FAC (ECF No. 15), which, after several extensions of time, has been fully

briefed and is ripe for disposition.

We have original jurisdiction over this action.  28 U.S.C. §§ 1331, 1441(a).

The allegations in the FAC are as follows. In 2013, the Defendants Rice Energy and Rice

Midstream Management were primarily involved with oil and gas land acquisition, oil and gas

well development, and oil and gas midstream transmission.  (FAC ¶ 13).  Both defendants

contacted farmers and other land owners in Western Pennsylvania and negotiated oil and gas

leases on land that had large deposits of Marcellus and Utica shale resources, and on land

suitable for midstream transmission. (FAC ¶ 14).   In 2013, the Defendants needed a petroleum

engineer with specialized knowledge of "completions"; that is, the process of hydraulic

fracturing ("fracking") of Marcellus and Utica Shale to produce natural gas.  (FAC ¶ 15).

Plaintiff is a petroleum engineer with special knowledge of completions, among other industry-

recognized innovation and operations. (FAC ¶ 16).

Plaintiff was first hired in that role on January 6, 2014 and served as a consultant for Rice

Midstream Management LLC. and the Vice President of Completions for Defendant Rice

Energy. (FAC ¶ 6).   He was terminated on October 31, 2016. (FAC ¶ 45). The stated reason for

his termination was his failure to report a conflict of interest, specifically  an ownership interest

in a supplier of Rice.  (FAC ¶ 58).

In 2013, the process of hydraulic fracturing of Marcellus and Utica Shale involved many

inter-related services that had to be assembled to accomplish efficient hydraulic fracturing, and

many of the contractors, subcontractors,  and service providers were privately owned and had

related interests.  (FAC ¶ 17).  Plaintiff was particularly well qualified to be Vice President of

Completions at Rice Energy because he was part of the closed shop and had access to the best contractors.  (FAC ¶ 18).   In particular, Plaintiff owned shares in a key contractor, who participated in Marcellus and Utica Shale completions, Silver Creek Services, ("SCS"). (FAC ¶ 19).  Plaintiff owned 25% of all the shares in SCS. (FAC ¶ 20).  had specialized knowledge and connections and was to be well paid by Rice Energy for his work. (FAC ¶ 21).

Plaintiff was to receive $185,000 per year and stock bonuses. (FAC ¶ 22).  Mr. Ajayi's stock bonuses were largely performance based, meaning that he would be paid more if the use of his specialized knowledge improved safety performance, well cost, and production volumes; generally, measures that drive up the stock price of Rice Energy and Rice Midstream Management LLC. (FAC ¶ 23).  By 2016 Plaintiff's compensation package was approximately $650,000.00.  (FAC ¶ 24).  As part of his compensation package Plaintiff was to receive:

> a. 24,242 shares of Rice Midstream Management stock under a Phantom Unit Agreement, all payable on December 22, 2016;

> b. 24,268 Shares of Rice Energy Stock under a Performance Stock Unit Agreement, paid in a step schedule with 2,417 shares payable on December 31, 2016; and

> c. 29,672 shares of Rice Energy Stock under the Restricted Stock Unit Agreement, payable in a stepped schedule with 3,283 shares payable in February 2017.

(FAC ¶ 25). The listed value of Plaintiff's stock portfolio was worth $1,954,525.00.  (FAC ¶ 26). The vesting date, according to Plaintiff, is somewhat longer than it takes to assemble, as he did, a highly efficient team of contractors, subcontractors and individual employees to provide completions services. (FAC ¶ 27).   He alleges the timing of the termination was in bad faith, as it was timed so that the Defendants would receive the benefits of Plaintiff's specialized knowledge without having to pay for it. (FAC ¶ 29).

The Plaintiff further alleges the following.  In 2014, the status of Rice Energy changed from a private corporation to a public corporation. (FAC ¶ 30).  Rice Energy issued an Initial

Public Offering on or about January 20, 2014. (FAC ¶ 31).  Plaintiff alleges "[w]orking with related parties is useful when the company is a private corporation; however, the related transactions must end when a private corporation goes public; or at least reported to the Securities and Exchange Commission, (SEC)." (FAC ¶ 32).  When Rice Energy became a publicly traded company, its shares were listed on the New York Stock Exchange and it was required to report related party transactions to the SEC. (FAC ¶¶ 33, 34).  Mr. Ajayi's conflict of interest involving SCS was fully known to Rice executives. The Company, through several executives and managers, had been monitoring the issue for years, including addressing occasional concerns that Rice showed favoritism to SCS and ensuring that the conflict was not adversely affecting Rice's business decisions. (FAC ¶ 35). All of Rice's audits showed that SCS had been charging Rice competitive prices for the services it provided and that it had been billing Rice correctly for services completed. (FAC ¶ 36).

For three years, 2014, 2015, 2016, Plaintiff reported his conflict of interest to Rice Energy but Rice Energy failed to report his conflict to shareholders. (FAC ¶ 37).  By early 2016, after Rice Energy had spent about $15- to $16 million a year on SCS's services over the previous two years, Rice's leaders determined that the conflict would need to be phased out and eventually eliminated; Plaintiff would need to sever his relationship with either SCS or with Rice. (FAC ¶ 38).  Plaintiff  alleges he had to sell all of his shares (worth about $4,300,000) to keep his job at Rice Energy. (FAC ¶ 39).

The ownership of such a large block of shares in SCS gave Mr. Ajayi, potentially, management rights in SCS. (FAC ¶ 40).  Plaintiff had to give up his potential management rights in SCS to keep his job at Rice Energy. (FAC ¶ 41).  Plaintiff informed Rice's executives that he was working on selling his SCS shares and severing his relationship with that company. (FAC ¶

42). Ultimately, on October 12, 2016, Plaintiff sold all his shares in SCS so that he could continue working at Rice Energy and keep his stock bonus plan with Rice Energy. (FAC ¶ 43). The sale of the SCS stock was a "quick sale" according to Plaintiff; Rice Energy gave Plaintiff a deadline and pressured him to have the sale done quickly, which caused Plaintiff to quickly sell $4,300,000 worth of SCS stock to someone without fully investigating their ability to pay the stock price or manage the stock. This, in turn, caused Plaintiff to incur and continue to incur substantial legal fees in his ongoing attempt to get paid and also caused Plaintiff to lose SCS stock value. (FAC ¶ 44).

On October 31, 2016, Plaintiff was terminated. He alleges that by that date he could be terminated without disruption of the fracking operations, because he had assembled the team of contractors, subcontractors and individual employees to provide completions services for fracking. (FAC ¶ 45). He alleges his wrongful termination caused the forfeiture of $1,954,525.00 of Rice Energy and Rice Midstream Management stock, which had yet to vest. (FAC ¶ 46). On the morning of December 22, 2016, the listed value of his stock portfolio went from $1,954,525.00 to zero. (FAC ¶ 47).

Plaintiff further alleges that other Rice employees were treated differently. Specifically, he alleges in 2015, and continuing in to 2016, Rice terminated the services of several employees and their step vested shares were either accelerated and paid in full, or allowed to vest over time. (FAC ¶ 48). These employees were: Gina (Banai) Berardinelli, Dave Miller, John Guoynes, and Robert "Coach" Rikeman. (FAC ¶ 48). Plaintiff further alleges that in 2016, Rice Energy terminated the services of several employees who had conflicts and their step vested shares were accelerated and paid in full. (FAC ¶ 49).

In 2016, the upper management of Rice Energy was considering a merger with EQT.

5

With a merger, all step vested shares of any persons who remained with Rice Energy on the date of merger would be accelerated and paid in full if they were terminated by EQT. (FAC ¶ 50).  Mr. Ajayi's step vested shares were not accelerated and paid in full or allowed to vest over time. (FAC ¶ 51).  Mr. Ajayi's stock was forfeited. (FAC ¶ 52). Mr. Ajayi's forfeited stock was then placed back in the stock pool according to the Rice Energy and Rice Midstream Long Term Incentive Plans. (FAC ¶ 53).  The management team were then eligible, under the Rice Energy and Rice Midstream Long Term Incentive Plans, to be awarded the forfeited stock. (FAC ¶ 54).  The management team received all or part of the forfeited stock. (FAC ¶ 55).  Rice Energy's official reason for termination was that Rice Energy "eliminated the conflict because it was creating unnecessary administrative burdens and Rice sought to make clear that such conflicts of interest were unacceptable." (FAC ¶ 56).

According to Plaintiff, Rice Energy's official reason for termination on October 31, 2016 was not legitimate because for three years, 2014, 2015, and 2016, his conflict of interest was a reportable event but Plaintiff remained on the payroll. Rice Energy simply failed to report the conflict of interest to the SEC. Moreover, he alleges that on the date of termination the conflict had already been eliminated because on October 12, 2016 he sold his SCS stock. Plaintiff avers his termination was delayed for an ulterior purpose: so that Rice Energy would have the full benefit of his specialized knowledge and expertise. He also alleges it was delayed for several more weeks, until after he sold his SCS stock, so that Rice Energy could continue doing business with SCS without fear of having poor relations with a major supplier. (FAC ¶ 57, a-c).

Plaintiff acknowledges that Rice Energy claimed, as its reason for termination, that Plaintiff had a second and separate conflict of interest: an unreported ownership interest in a second supplier Parco Slickline Services LLC ("Parco").  He alleges this stated reason is not

legitimate for a number of reasons.  First, he denies having had an ownership interest in that

entity, and even if he had, it did not supply goods or services to Rice Energy; in the absence of a

conflict of interest, there was nothing to report to Rice Energy which would be subject to Rice

Energy's pre-approval. (FAC ¶ 58). Plaintiff alleges Rice Energy's investigation into his

ownership interest in Parco was to establish a pretense for the termination, rather than legitimate

business management fact-finding, and that in any case, Rice Energy knew he had divested

himself from both SCS and Parco on October 12, 2016.  According to Plaintiff his termination

was timed so that Defendants would receive the benefits of his specialized knowledge without

having to pay for it, for example, the costs savings  as to the Marcellus wells and Utica wells,

arising out of his knowledge of completions. (FAC ¶ 59 a, b). Plaintiff alleges his specialized

knowledge of completions helped put Rice Energy in the position to receive a $6.7 billion dollar

valuation and subsequent acquisition of Rice Energy by EQT in 2017.  He further alleges his

specialized knowledge of completions helped put Rice management in the position to take

control of the board and CEO management positions at EQT during the proxy contest in 2019.

(FAC ¶ 59 c, d).

Attached to Plaintiff's FAC are eleven exhibits, including the following, which are

central to Plaintiff's allegation that he had a "contract of continued employment" and that his

contract with Rice was amended.   Exhibit 1 is an email between Rice's then-President and COO

Toby Rice to then-Rice General Counsel Will Jordan and others, which states that Plaintiff "is

motivated to sell [his SCS stock]" and "will have an update on the process to us by Friday."[2]

---

[2] Mr. Rice states:

    [I was ] Talking with Danny [Rice, the CEO] and [ we ] wanted to keep you in the loop on some
    things related to Service Providers that have conflicts with Rice personnel ownership. Three
    companies have conflicts: Silver Creek Services (Tunde and Didier): We are moving to remove
    this conflict by encouraging a sale of conflicted parties interests in Silver Creek Services. Tunde is
    motivated to sell, he will have an update on the process to us by Friday ...

Pl.'s Ex. 1. Exhibit 1A is a letter from an investment advising firm to a representative of SCS providing "an update on [its] progress in finding an investor to purchase minority interest(s) in [SCS]." Pl.'s Ex. 1A. Exhibit 1B is an email from Plaintiff updating Rice about the sale of his SCS stock.

Plaintiff has also attached to the FAC the following documents:[3] the Phantom Unit Agreement dated December 22, 2014 ("PU Agreement"), Pl.'s Ex. 5; the Performance Stock Unit Agreements dated May 8, 2014, February 9, 2015, and February 29, 2016 ("PSU Agreements"), Pl.'s Exs. 7 - 9; and the Restricted Stock United Agreements dated May 5, 2014, February 9, 2015, February 29, 2016, June 27, 2015, June 27, 2016, and February 29, 2016 ("RSU Agreements"), Pl.'s Exs. 10 - 15. (ECF Nos. 11-11 through 11-21).

The FAC alleges the following causes of action.  Count I alleges breach of contract for continued employment, Count II alleges promissory estoppel for continued employment, and Count III alleges breach of implied covenant of good faith and fair dealing.   The parties agree that the first three Counts of the FAC are governed by Pennsylvania law.

Count IV alleges breach of contract as to the Phantom Unit Agreement, Count VI alleges breach of contract as to the Performance Stock Unit Agreement, and Count VIII alleges breach of contract as to the Restricted Stock Unit Agreement.   Plaintiff further alleges bad faith breach of contract as to each of these agreements (Count V, Phantom Unit Agreement; Count VII Performance Stock Unit Agreement; Count IX, Restricted Stock Unit Agreement). There is no dispute that by their terms these Award Agreements are governed by Delaware law.

Count XI[4] alleges violations of the Pennsylvania Wage Payment and Collection Law ("WPCL"), 43 P.S. § 260.1, *et seq.*

---

[3] These will be described in further detail *infra.*
[4] Count X alleges race discrimination, in violation of 42 U.S.C. § 1981, and is not subject to the motion to dismiss.

8

## II.  Standard of Review

A motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the complaint.  *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993).  In deciding a motion to dismiss, the court is not opining on whether the plaintiff will likely prevail on the merits; rather, when considering a motion to dismiss, the court accepts as true all well-pled factual allegations in the complaint and views them in a light most favorable to the plaintiff.  *U.S. Express Lines Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002).  While a complaint does not need detailed factual allegations to survive a Rule 12(b)(6) motion to dismiss, a complaint must provide more than labels and conclusions.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  A "formulaic recitation of the elements of a cause of action will not do."  *Id.* (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S.  at 554.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).  The Supreme Court of the United States has explained:

> The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

*Id.* (quoting *Twombly*, 550 U.S. at 556) (internal citations omitted).

The United States Court of Appeals for the Third Circuit instructs that "a court reviewing the sufficiency of a complaint must take three steps." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016). The court explained:

> First, it must "tak[e] note of the elements [the] plaintiff must plead to state a claim." *Iqbal*, 556 U.S. at 675. Second, it should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679; *see also Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 224 (3d Cir. 2011) ("Mere restatements of the elements of a claim are not entitled to the assumption of truth." Finally, "[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679.

*Connelly*, 809 F.3d at 787. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679 (internal citations omitted).

In addition to reviewing the facts contained in the complaint, a court may consider "matters of public record, orders, exhibits attached to the complaint and items appearing in the record of the case." *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384 n.2 (3d Cir. 1994). When a document integral to or relied upon in the complaint is included, the court may also consider that document. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).

Although a district court is not obligated to permit leave to amend before dismissing a complaint in a non-civil rights case, *Wolfington v. Reconstructive Orthopaedic Assocs. II P.C.*, 935 F.3d 187, 210 (3d Cir. 2019), courts generally grant leave to amend unless amendment of the complaint would be inequitable or futile. *See, e.g., Bachtell v. Gen. Mills, Inc.*, 422 F. Supp. 3d 900, 915 (M.D. Pa. Oct. 1, 2019) (citing *Phillips v. Allegheny Cty.*, 515 F.3d 224, 245 (3d Cir. 2008)).

### III. Discussion

Central to Defendant's motion to dismiss is the argument that Plaintiff was an at-will employee of Rice, and that, accordingly, even accepting the factual allegations in the FAC as true, when read in conjunction with the documents attached to the FAC upon which Plaintiff relies, Plaintiff has failed to state a claim. Rice argues it lawfully terminated Plaintiff's at-will employment after discovering he had an undisclosed ownership interest in a Rice Service provider. According to Rice, Plaintiff forfeited all of the unvested shares that were awarded under the Rice Midstream Management 2014 Long Term Incentive Plan ("Midstream Plan") and the Rice Energy 2014 Long Term Incentive Plan ("Rice Plan") and the Award Agreements thereunder.

The following is a summary of the information established in the documents, attached to the FAC, which Defendant uses to support its argument that Plaintiff was an at-will employee[5] who could be terminated for any reason, and further, that the express terms of the Award Agreements permitted Rice to consider the unvested shares as forfeited because Plaintiff did not remain employed until the vesting date.

First, Plaintiff's offer letter dated December 10, 2013, Exhibit 1C to the FAC, states: "You may terminate your employment with the Company at any time for any reason and, except as provided in a written agreement signed by an Officer of the Company, the Company may terminate your employment at any time for any reason." (ECF No. 11-4 at 2). Plaintiff signed this offer of employment letter on December 10, 2013. (ECF No. 11-4 at 2).

---

[5] The Court will disregard Defendant's citation to Plaintiff's testimony in another lawsuit (ECF No. 21 at n.2), as this is outside the appropriate scope of matters which may be considered in deciding a motion to dismiss. No party has requested the pending motion be converted to a motion for summary judgment.

The Rice Midstream Partners LP 2014 Long Term Incentive Plan, which governed the

Phantom Unit Agreement, is attached to the FAC as Exhibit 4.  It provides:

> The grant of an Award shall not be construed as giving a Participant [Plaintiff] the right to be retained in the employ of the General Partner or any Affiliate [Defendant], to continue providing consulting services, or to remain on the Board, as applicable. Furthermore, the General Partner or an Affiliate may at any time dismiss a Participant from employment . . . free from any liability or any claim under the Plan, unless otherwise expressly provided in the Plan, any Award Agreement, or other agreement.

Pl.'s Ex. 4 at 16.  The Phantom Unit Agreement, dated December 22, 2014, attached to the FAC

as Exhibit 5, states:

> [t]he Phantom Units are restricted in that they may be forfeited by the Service Provider [Plaintiff]. . . . Subject to the terms and conditions of this Agreement, the forfeiture restrictions on the Phantom Units shall lapse, and the Phantom Units shall vest as follows: two (2) years from the Date of Grant; provided, however, that such restrictions will lapse, and the Phantom Units shall vest in accordance with the foregoing provision only if the Service Provider has continuously provided services to the Partnership Entities from the Date of Grant until the date of Vesting.

Pl.'s Ex. 5 at ¶ 4. It also provides that "[i]f the Service Provider experiences a separation from

service with the Partnership Entities for any reason prior to the date all Phantom Units have

vested . . . , then all Phantom Units granted pursuant to this Agreement that have not yet vested

shall become null and void as of the date of such separation from service." *Id.* at ¶ 5.

Furthermore:

> Unless otherwise provided in a written employment agreement or by applicable law, the [Plaintiff] Employee's employment by the [Defendant] Company shall be on an at will basis, and the employment relationship may be terminated at any time by either the Employee or the Company for any reason whatsoever, with or without cause or notice.

Pl.'s Ex. 3, ¶ 13.  The Rice Midstream and Phantom Unit Agreements are the basis of Plaintiff's

claims at Counts IV and V, wherein he seeks damages in an amount of 24, 242 shares of Rice

Midstream Management Stock.

The Rice Energy Performance Stock Unit Agreement dated May 2014, attached to the

FAC as Exhibit 7, states:

> Nothing in the adoption of the Plan, nor the award of the Performance Stock Units hereunder, shall confer upon the Employee the right to continued employment by, or service with, the Company or its Subsidiaries or affect in any way the right of the Company or its Subsidiaries to terminate such employment or any services provided at any time. Unless otherwise provided in a written employment agreement or by applicable law, the Employee's employment by the Company shall be on an at-will basis, and the employment relationship may be terminated at any time by either the Employee or the Company for any reason whatsoever, with or without notice. Any question as to whether and when there has been a termination of such employment and services, and the cause of such termination, shall be determined by the Committee or its delegate, and its determination shall be final.

Pl's Ex. 7 at ¶13.  Each yearly agreement thereafter, the February 2015 and February 2016 PSU

Agreements, contains the same language.  Pl's Ex. 8 at ¶ 13; Pl's Ex. 9 at ¶ 13.  The PSU

Agreements are the subject of the claims alleged in Counts VI and VII, wherein Plaintiff seeks

24,268 shares of Rice Energy Stock.

The May 2014 Restricted Stock Unit Agreement, attached to the FAC, states:

> Nothing in the adoption of the [Long-Term Incentive] Plan, nor the award of the Restricted Stock Units thereunder pursuant to this Agreement, shall confer upon the Employee the right to continued employment by the company or affect in any way the right of the Company to terminate such employment at any time. Unless otherwise provided in a written employment agreement or by applicable law, the Employee's employment by the Company shall be on an at-will basis, and the employment relationship may be terminated at any time by either the Employee or the Company for any reason whatsoever, with or without cause or notice.

Pl.'s Ex. 10 at ¶ 7. The February 2015 RSU Agreement contains the same language.[6]

Pl.'s Ex. 11 at ¶ 7.  The June 2016 RSU Agreement and the February 2016 RSU

---

[6] Plaintiff has attached page 1 only of the RSU Agreement dated February 2016; this exhibit does not include the at-will provision on that page.  (Pl.'s Ex.12).  Plaintiff's Exhibit 13 is a letter dated June 27, 2016 informing Plaintiff that the RSU component of his annual compensation has been increased; it is silent as to any at-will employment provision. (Pl.'s Ex. 13).

Agreement contain the same language as well, with the addition that the employment relationship may be terminated at any time by a subsidiary of the company for any reason whatsoever.  Pl.'s Ex. 14. at ¶ 8; Pl.'s Ex. 16 ¶ 8.  The RSU Agreements are the subject of the claims alleged in Counts VIII and IX, wherein Plaintiff seeks 29,672 shares of Rice Energy stock.

### A. Counts I, II, and III:  Continued Employment Claims under by Pennsylvania Law

Pennsylvania presumes employment to be at-will; either an employer or employee may terminate employment at any time, for any or no reason, absent a statute or contract to the contrary. *See, Hardee–Guerra v. Shire Pharmaceuticals*, 737 F.Supp.2d 318, 325 (E.D. Pa. 2010) (reiterating presumption of at-will employment); *Scully v. U.S. WATS, Inc*., 238 F.3d 497, 505 (3d Cir. 2001) A plaintiff may overcome this presumption by demonstrating one of the following:  (a) an express contract between the parties setting a definite term or requiring termination only for cause; (b) an implied-in-fact contract where all of the surrounding circumstances of the hiring indicate that the parties did not intend the employment to be at-will; or (c) and implied-in-fact contract plus additional consideration passing from the employee to the employer from which the court can infer the parties intended to overcome the at-will presumption. *Natale v. Winthrop Res. Corp*., No. 07–4686, 2008 WL 2758238, at *3 (E.D. Pa. July 9, 2008) (citing *Veno v. Meredith*, 357 Pa. Super. 85, 515 A.2d 571, 577 (1986)). "Evidence of a subjective expectation of a guaranteed employment period, based on employer practices or vague employer superlatives, is insufficient." *Scully,* 238 F.3d at 505.

> That the at-will presumption cannot be easily overcome is emphasized in several opinions. "The burden of proof here is very great," *DiBonaventura v. Consolidated Rail Corp.*, 372 Pa. Super. 420, 424, 539 A.2d 865, 867 (1988), and only "clear evidence that the parties intended to contract for a definite period" will set aside the presumption, *Greene [v. Oliver Realty, Inc.]*, 363 Pa. Super. [534] at 551, 526 A.2d [1192] at 1200 [ ( (1987)]. "Great clarity is necessary to contract away the at-will

presumption." *Scott v. Extracorporeal, Inc.*, 376 Pa. Super. 90, 99, 545 A.2d 334, 338 (1988). *Veno v. Meredith*, 357 Pa. Super. 85, 99, 515 A.2d 571, 578 (1986), elaborated on that theme: "The modification of an 'at-will' relationship to one that can never be severed without 'just cause' is such a substantial modification that a very clear statement of an intention to so modify is required."

*Schoch v. First Fidelity Bancorporation*, 912 F.2d 654, 660 (3d Cir.1990).

 1. Count I: Breach of Contract for Continued Employment

 Plaintiff argues he has alleged sufficient facts to support an implied-in-fact contract plus additional consideration passing from the him to Rice from which the Court can infer the parties intended to overcome the at-will presumption. In response, Rice argues even taking the facts as alleged in a light most favorable to Plaintiff, and considering the documents that Plaintiff attached to the FAC, he has not plausibly alleged a contract for continued employment, citing *Turkmenler v. Almatis, Inc.,* No. 11-1298, 2012 WL 1038866 (W.D. Pa. March 28, 2012). In *Turkmenler*, the court granted defendant former employer's partial motion to dismiss, in particular, the claim for a breach of implied contract, because Plaintiff had entered into an express, written contract specifically defining his employment as at-will. *Id.* at *3.:

> *Although a plaintiff may rebut his at-will status by establishing additional consideration, where a plaintiff has acknowledged that his employment is at-will, a showing of additional consideration will not suffice to rebut the presumption. Willis v. American Customer Care*, 2006 WL 3042982 (M.D. Pa.2006); *Sharp v. BW/IP Intern., Inc.*, 991 F. Supp. 451 (E.D. Pa.1998) ("employee must show that both parties intended to make a contract"). *See also Peremeter v. Crown Cork & Seal Co., Inc.*, 38 F.Supp.2d 372, 380 (E.D. Pa.1999) ("Even if the court were to find additional consideration, the [at-will] disclaimers require the court to interpret this as an at-will contract").
>
>    . . .
>
> The United States District Court for the Eastern District of Pennsylvania *in Sharp v. BW/IP Intern., Inc.*, 991 F. Supp. 451 (E.D. Pa.1998) held that where parties agreed to at-will employment, additional consideration is insufficient to rebut the at-will presumption. *Id.* at 459 (plaintiff sold home to move closer to his workplace at immediate supervisor's request and was subsequently terminated). In Sharp, the employee, before initiating his employment, received an offer letter stating that his employment status was at-will and also signed a disclaimer acknowledging his employment status was at-will. *Id.* The court refused to rebut

the at-will presumption because the parties "specifically agreed that the employment [was] at-will, [and] even though additional consideration [was] present, [a court must] construe the contract according to the parties' stated intention," and find the employment was at will. *Id.* (relocation was not discussed prior to employment and no one, aside from the immediate supervisor, indicated that employment was contingent upon the plaintiff's relocation). Accordingly, where an employee has acknowledged or signed a document recognizing his employment as at-will, he may not rebut that presumption by alleging an implied-in-fact contract based upon the employee's additional consideration.

In the instant case, prior to Plaintiff's acceptance of employment with Defendant, the parties specifically agreed that Plaintiff's employment was at-will. It is undisputed that Plaintiff received and executed the Employment Agreement. Despite the fact that Plaintiff moved from Canada, left his former employment, entered into a rental agreement, purchased a car which cannot be transported back to Canada and left his wife and children for a period of time, Plaintiff's acknowledgment and execution of the Employment Agreement stating that he was an at-will employee dictates that his employment was of an at-will nature. To find otherwise would render the Employment Agreement meaningless.

*Id.* at *5-6 (emphasis added).

Plaintiff herein argues that he presented additional consideration, in the form of the sale of his SCS stock. He has alleged that "Rice's leaders determined that the conflict would need to be phased out and eventually eliminated; Mr. Ajayi would need to sever his relationship with either SCS or Rice." This, he claims, modified the existing contract. However, because he acknowledged and signed documents recognizing his at-will status, including his offer letter and the Award Agreements, and despite having alleged the stock sale constituted additional consideration, he cannot rebut the presumption of at-will status. *Turkmenler* at *5; *Peremeter v. Crown Cork & Seal Co., Inc.*, 38 F.Supp.2d 372, 380 (E.D. Pa. 1999) ("Even if the court were to find additional consideration, the [at-will] disclaimers require the court to interpret this as an at-will contract.").

Accordingly, Count I will be dismissed for failure to state a claim.

2. Count II: Promissory Estoppel For Continued Employment

Plaintiff argues that a promise of employment was made to him when he sold his SCS stock, and that although a presumption of employment at-will exists, it is rebutted in this case. He alleges "Defendant Rice Energy is barred, by promissary [sic] estoppel, from terminating the employment of Plaintiff." (FAC ¶ 67). He further argues there was a second promise, i.e.  a "promise of stock payment," noting other employees who had conflicts and were terminated, but Defendant accelerated their step vested shares and paid them in full.  (ECF No. 21 at 9).

The elements of promissory estoppel are: 1) misleading words, conduct or silence by the party against whom the estoppel is asserted, 2) unambiguous proof of reasonable reliance on the misrepresentation by the party seeking to assert the estoppel, and 3) no duty of inquiry on the party seeking to assert estoppel. *Rinehimer v. Luzerne County Community College*, 539 A.2d 1298, 1306 (Pa. Super. 1988).

In *Walden v. Saint Gobain Corp.*, 323 F.Supp.2d 637, 646-47 (E.D. Pa. 2004), plaintiff alleged, as Plaintiff herein does, that the at-will presumption was overridden by his additional consideration, arguing defendant Saint Gobain promised him employment only if he would immediately resign from his position with his then-current employer, and that Saint Gobain reasonably should have expected that this conditional offer would induce him to quit his job, move, and start working at Saint Gobain. As is the case here, the at-will employment was memorialized in a written agreement:

> In the instant case, the Court's analysis does not proceed from a mere "presumption" that Walden was an at-will employee; Walden specifically affirmed the at-will nature of his employment in the Agreement with Glotel. The Agreement states that "[Walden] understands and agrees that [Glotel] may terminate [Walden's] engagement at any time and for any reason, with or without cause, and with or without notice." The "additional consideration" theory of recovery is "an intention-discerning mechanism"; it provides an avenue for establishing the parties' intention that the employment relationship would not be terminable at-will. However, where the parties' intention regarding this specific issue is memorialized and agreed upon in an unambiguous written contract, as it is

here, "the intent of the parties is to be ascertained from the document itself." Therefore, even if Walden could establish that he provided Saint Gobain with additional consideration, the terms of the Agreement completely preclude him from establishing that his or Saint Gobain's conduct or statements evidence an intent to modify the at-will presumption. None of the cases that Walden cites found that additional consideration warranted an exception to the at-will doctrine when terms of the employment contract defined the employment relationship as at-will. By contrast, other courts from this district have found the existence of a specific agreement for at-will employment defeats any effort to supplant the at-will presumption. The same reasoning applies here.

*Id.* at 647. The court held that because Pennsylvania does not recognize a cause of action for promissory estoppel in the at-will employment context, the Plaintiff's claim for promissory estoppel must fail, rejecting Plaintiff's argument that he was entitled to an exception to the at-will doctrine because he gave "additional consideration." *Id.* at 646.

Plaintiff alleges that promissory estoppel is appropriate in the circumstances in this case. Principally, Plaintiff alleges promissory estoppel as to his employment termination which we find fails to state a claim upon which relief may be granted. *Satterfield v. Borough of Schuylkill Haven*, 12 F.Supp.2d 423, 441 (E.D. Pa.1998) ("Pennsylvania law clearly provides that the doctrine of equitable estoppel does not apply to at-will employment."); *Woomer v. Landis & Gyr, Inc.*, No. Civ.A.97–2074, 1997 WL 256940, at *2 (E.D. Pa. May 1, 1997) ("Pennsylvania courts generally do not recognize a cause of action for detrimental reliance or estoppel as an exception to the employment at-will doctrine.").

To the extent Plaintiff argues a "second promise" (a "promise of stock payment"), i.e. that Rice promised him it would vest his stock interests in Rice if he sold his shares in SCS, this claim, too, fails as he has not alleged sufficient facts to support a plausible claim. Plaintiff has argued that Rice caused him to rely on an implied promise, i.e. other employees were paid their step vested shares at the time of termination, but he was not. Yet Pennsylvania law requires a claim for promissory estoppel to be based upon an express promise, not a broad and vague

implied promise. *C&K Petroleum Products, Inc. v. Equibank*, 839 F.2d 188, 191 (3d Cir. 1988) ("promissory estoppel would be rendered meaningless if this Court were to allow [plaintiff] to maintain an action for detrimental reliance based on the alleged existence of ... a broad and vague implied promise."); *see also Nabisco, Inc. v. Ellison*, 1994 WL 622136, at *7 (E.D. Pa. Nov. 8, 1994) ("Allowing a claim for promissory estoppel to be based on an implied promise would in effect allow a claim to be based upon the plaintiff's subjective expectations."). Plaintiff's allegation that based on what other employees may have received is insufficient to support his claim of promissory estoppel. Here no factual allegations are made that Rice made explicit or expressed promise to allow his stocks to vest.

Because Pennsylvania courts do not recognize a cause of action for promissory estoppel in the context of at-will employment, and because plaintiff has failed to state a claim upon which relief may be granted, Count II will be dismissed.

3. Count III:  Bad Faith Breach of Contract for Continued Employment (Implied Covenant of Good Faith and Fair Dealing)

Plaintiff alleges that his termination was in bad faith and that Rice breached an implied duty of good faith and fair dealing to continue his employment.  In *White v. Lowe's Home Centers*, LLC, 2016 WL 4207970 (E.D. Pa. Aug. 10, 2016), the court granted defendant's motion to dismiss as to a former employee's breach of implied warranty of good faith and fair dealing, finding:

> . . . like his promissory estoppel claim, White cannot bring this claim under Pennsylvania law. The Pennsylvania Superior Court held in *Donahue v. Federal Exp. Corp*., 753 A.2d 238, 243 (Pa. Super. 2000), that a plaintiff "cannot as a matter of law maintain an action for breach of the implied duty of good faith and fair dealing, insofar as the underlying claim is for termination of an at-will employment relationship.

Id. at *4.  Indeed, even in the absence of an at-will employment agreement, an action for the implied covenant of good faith and fair dealing is not a cognizable and separate cause of action under Pennsylvania law. *See Simmons v. Nationwide Mut. Fire Ins. Co*., No. 11–328, 2011 WL 1527800, at *4 (W.D. Pa. April 20, 2011) ("... Pennsylvania law does not recognize a separate breach of contractual duty of good faith and fair dealing where said claim is subsumed by a separately pled breach of contract claim") (collecting Pennsylvania cases holding the same).

Because Plaintiff's claim for breach of the implied covenant of good faith and fair dealing fails as a matter of law, in the context of the termination of his at-will employment, Count III will be dismissed for failure to state a claim.

## B. Counts IV through IX:  Breach of Award Agreements Governed by Delaware Law
### Breach of Award Agreements

Rice argues that the claims brought for breach of the Phantom Unit, Phantom Stock Unit and Restrictive Stock Unit Award Agreements, Counts IV, VI, and VIII, respectively, should be dismissed because the clear terms of the Award Agreements[7] provide Plaintiff would forfeit his unvested shares if he was terminated before the vesting date.  In response, Plaintiff's argues that the Award Agreements were amended and therefore he may recover the value of the unvested shares. Rice contends that these claims fail, given the plain language of the Award Agreements and applicable plans, which require any amendments to those Award Agreements  be in writing and signed by the parties. In the absence of an allegation of a written, signed amendment, and accepting as true all well-pled factual allegations in the complaint and viewing them in a light most favorable to the Plaintiff, as well as after consideration of the  all relevant documents which are integral to the FAC, we will grant the motion to dismiss as to each of Counts IV, VI and VIII.

---

[7] There is no dispute that each of the Award Agreements are governed by Delaware law.

Each of the Award Agreements state they can be amended in writing if certain other conditions are met. See, e.g., Pl.'s Ex. 5 at ¶ 12(d) (providing that the PU Agreement can be amended only "by a written agreement executed by the General Partner and the Service Provider"); Pl.'s Exs. 7 – 9 at ¶ 16(a)-(b) (providing that the PSU Agreements may only "be amended or modified at any time by an instrument in writing signed by the parties"); Pl.'s Ex. 10 at ¶ 10 (providing that the RSU Agreements "may not be modified in any respect by a verbal statement, representation or agreement made by any employee, officer, or representative of the Company or by any written agreement unless signed by an officer of the Company who is expressly authorized by the Company to execute such document").

The rules governing the construction of contract provide that the parties are bound by the terms of their agreement. *Harry H. Rosin Co. v. Eksterowicz*, 73 A.2d 648, 651 (Del. Super.Ct. 1950). Accordingly, courts are to read the contract as a whole and give its provisions their ordinary meaning. *Citadel Holding Corp. v. Roven*, 603 A.2d 818, 822 (Del.1992). That is, unless a contrary intent plainly appears, "the intent of the parties must be ascertained from the language of the contract." *Id.* Courts should not rewrite the plain language of "an otherwise valid contractual provision," even to supply perceived omissions. *Ed Fine Oldsmobile, Inc. v. Diamond State Tel. Co.*, 494 A.2d 636, 638 (Del.1985); *Conner v. Phoenix Steel Corp.*, 249 A.2d 866, 868 (Del.1969). Nor are courts to make any sort of value judgment about a contract whose meaning is clear. *Ryan v. Weiner*, 610 A.2d 1377, 1380 (Del.Ch.1992). "In the absence of ambiguity, there is no room for interpretation or a search for the intent of the parties." *Myers v. Myers,* 408 A.2d 279, 280 (Del.1979).  While a written contract may be modified by subsequent agreements, consent of both parties and consideration are required, and the new contract must be of such specificity "as to leave no doubt of the intention of the parties to change what they

previously solemnized by formal document. *Reeder v. Sanford School, Inc*., 397 A.2d 139, 141 (De. Super. Ct. 1979).

Plaintiff has not plausibly alleged that the Award Agreements were amended as required by the clear terms therein, such that he could pursue a claim that the parties agreed his employment would be continued if the SCS stock were sold or even that his shares would be vested notwithstanding his termination.

1. Count IV:  Breach of the Phantom Unit ("PU") Agreement

The terms of the PU agreement provide that should Plaintiff experience a separation from service by Rice Energy prior to the date  of vesting of the Phantom Units, said units become null and void  as of the date of separation from service under the Midstream Plan.  Ex. 5 at ¶¶ 4-5. The PU Agreement states, "[i]f the Service Provider experiences a separation from service with the Partnership Entities for any reason prior to the date all Phantom Units have vested in accordance with Section 4 above, then all Phantom Units granted pursuant to this Agreement that have not yet vested shall become null and void as of the date of such separation from service." Pl.'s Ex. 5 at ¶¶ 4-5. The phantom units would vest only if he "has continuously provided services to the Partnership Entities from the Date of Grant to the date of vesting. *Id.* ¶ 4. The Midstream Plan defines an "Affiliate" as "with respect to any Person, any other Person directly or indirectly through one or more intermediaries' controls, is controlled by or is under common control with the Person in question." Pl.'s Ex. 4. Plaintiff has alleged that Rice Energy is not a "partnership entity" or "affiliate" under the relevant plans.  FAC. at ¶ 86.  In response, Defendant has attached to its motion, appropriate for consideration on a pending motion to dismiss given its public record status, the Rice Midstream Partners LP form S-1 Registration Statement dated November 2014, which establishes that Rice Midstream Management LLC is a wholly owned

subsidiary of Rice Energy Inc. Therefore, Plaintiff's termination by Rice Energy triggered forfeiture of the stock options under the Midstream Plan pursuant to the terms of the PU Agreement. Plaintiff alleges that certain evidence, attached to and relied upon in the FAC, evinces an amendment to the Award Agreements.

Plaintiff has argued that even if Rice can be considered an affiliate or partner under the PU, the PU was legally amended.  As noted supra, the PU Agreement provides that it can be amended only "by written agreement executed by the General Partner and the Service Provider[.]" ¶ 12(d). Yet the documents upon which Plaintiff relies make no reference to the PU Agreement and show no written statements indicating any intent to be bound to any amendment which would permit Plaintiff to pursue a breach of contract.   As mentioned *supra,* Exhibit 1 is an email between Rice's then-President and COO Toby Rice to then-Rice General Counsel Will Jordan and others, which states that Plaintiff "is motivated to sell [his SCS stock]" and "will have an update on the process to us by Friday."   Pl.'s Ex. 1. Daniel Rice was courtesy copied to that email. Exhibit 1A is a letter from an investment advising firm to a representative of SCS providing "an update on [its] progress in finding an investor to purchase minority interest(s) in [SCS]." Pl.'s Ex. 1A.  Exhibit 1B is an email from Plaintiff updating Rice about the sale of his SCS stock, and Daniel Rice was a recipient of the email. These documents are not sufficient to support Plaintiff's allegation that the PU Agreement was amended and he has failed to state a claim upon which relief can be granted.

Accordingly, Count IV will be dismissed.

2. Count VI:  Breach of the Phantom Stock Unit ("PSU") Agreement

Plaintiff alleges that he did not forfeit all of the Phantom Stock Units under the PSU Agreements upon his termination.  The PSU states "if Employee's employment and service with

23

the Company and its Subsidiaries terminates prior to the end of the Performance Period . . . . then, as of such date . . . , all of the Employee's Performance Stock Units covered by this Agreement shall be automatically canceled and forfeited in their entirety . . . ." Pl's Ex. 7 at ¶ 6(a).  The PSU Agreement also provides that it "constitutes the entire agreement between the Employee and the Company with respect to the subject matter of this Agreement" and that the Agreements may only "be amended or modified at any time by an instrument in writing signed by the parties[.]" Exs. 7 – 9 at ¶ 16(a)-(b).  Plaintiff avers that "by custom and practices" and as reflected "in writing' he gave up "his shares in SCS in exchange for early vesting and continued employment." FAC at ¶ 109.   Again, the purported "amendment" is alleged to have been memorialized in the emails previously discussed, which merely confirm Plaintiff was selling his SCS stock as part of the Rice decision to phase out his conflict of interest.  They fail to state an expressed intention to be legally bound by way of a written instrument signed by both parties. Nor is there sufficient factual support, as opposed to a conclusory allegation, that the appropriate authority entered into a written agreement to modify the RSU Agreement such that Plaintiff could be considered to have stated a claim that Rice intended to accelerate the vesting of his shares upon his termination.  We find that Plaintiff has failed to set forth sufficient factual allegations and has failed to state a claim as to Count VI.

Accordingly, the motion to dismiss will be granted with respect to Count VI.

3. Count VIII:  Breach of the Stock Unit ("RSU") Agreement

Count VIII alleges breach of contract as to the most recent Restricted Stock United Agreement dated  February 29, 2016.[8]  The RSU Agreements contain integration clauses which provide they each are the entire agreement between the employee and the company, and further,

---

[8] The prior RSU Agreements were dated May 5, 2014, February 9, 2015, February 29, 2016, and June 27, 2015.

they "may not be modified in any respect by a verbal statement, representation or agreement made by any employee, officer, or representative of the Company or by any written agreement unless signed by an officer of the Company who is expressly authorized by the Company to execute such document." Pl.'s Ex. 10 at ¶ 10. As with other claims, Plaintiff alleges the RSU Agreements were amended by custom and practice because in other instances, Defendant accelerated vesting for employees who themselves were also subject to conflicts of interest.  He claims he gave up "his shares in SCS in exchange for early vesting and continued employment." FAC ¶ 136. He alleges that the alleged agreement between Rice Energy and Plaintiff was "memorialized in writing." Compl. ¶ 142(b)(i), citing Pl.'s Ex. 2, which is a portion of a position statement submitted to OSHA by Rice Energy in an administrative matter. For the reasons previously stated with respect to Counts IV and VI, plaintiff has failed to allege sufficient factual allegations on which a claim for a breach of the RSU Agreement could survive a motion to dismiss.  There are no written amendments which specifically reference or memorialize an understanding between the parties or a meeting of the minds sufficient to constitute an enforceable promise by Rice to  vest his interest in exchange for the sale of SCS stock.

### Counts V, VII and IX:  Bad Faith Breach of Contract

In Counts V, VII, and IX Plaintiff alleges that the termination of his interests under the Award Agreements without accelerated stock vesting was in bad faith. "In order to plead successfully a breach of an implied covenant of good faith and fair dealing, the plaintiff must allege a  specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff." *Anderson v. Wachovia Mortg. Corp.,* 497 F. Supp. 2d 572, 581–82 (D. Del. 2007), citing *Fitzgerald v. Cantor*, Civ. A. No. 16297–NC, 1998 WL 842316, at *1 (Del. Ch. Nov.10, 1998).

In support of its motion to dismiss, Rice argues that Plaintiff has failed to state a claim because Plaintiff's shares were forfeited upon his termination, as explicitly provided by the terms of the Plans and Award Agreements, which control any alleged contractual breach.  As one court explained:

> The covenant is "best understood as a way of implying terms in the agreement," whether employed to analyze unanticipated developments or to fill gaps in the contract's provisions. Existing contract terms control, however, such that implied good faith cannot be used to circumvent the parties' bargain, or to create a "free-floating duty...unattached to the underlying legal document." Thus, one generally cannot base a claim for breach of the implied covenant on conduct authorized by the terms of the agreement.

*Dunlap v. State Farm Fire and Cas. Co*., 878 A.2d 434, 441 (Del. 2005), *citing, inter alia*,  *Hall v. Resolution Trust Corp*., 958 F.2d 75, 79 (5th Cir.1992) ("An agreement made by the parties and embodied in the contract itself cannot be varied by an implicit covenant of good faith and fair dealing."), *quoting Exxon Corp. v. Atlantic Richfield Co*., 678 S.W.2d 944, 947 (Tex.1984); *Terry A. Lambert Plumbing Inc. v. Western Sec. Bank*, 934 F.2d 976, 983 (8th Cir.1991) ("Acting according to express terms of a contract is not a breach of good faith and fair dealing."); *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1357 (7th Cir.1990) ("Any attempt to add an overlay of 'just cause' ... to the exercise of contractual privileges [based on the UCC's requirement of 'honesty in fact'] would reduce commercial certainty and breed costly litigation."

Upon review of the Award Agreements, the applicable case law and the conclusory allegations in the FAC, and  upon appropriate consideration of Plaintiff's unavoidably threadbare response to Defendant's arguments,  we find that under the express terms of the Award Agreements, the Award Agreements  specifically authorize the forfeiture of Plaintiff's unvested

interests upon his termination, which arose out of his at-will employee status.[9]  No claim for breach of an implied covenant is viable here.  The agreements contain disclaimers which make clear Plaintiff was an at-will employee.         Accordingly, the motion to dismiss will be granted with respect to each of the claims asserted at Counts V, VII, and IX.

### C. Count XI:  Pennsylvania Wage Payment and Collection Law

Rice argues that because Plaintiff cannot establish any contractual right to the shares under the applicable Plans and Award Agreements, his claim under the Wage Payment and Collection Law ("WPCL"), 43 Pa. Stat. Ann. § 260.1 *et seq.* must be dismissed.

The WPCL requires employers to pay a separated employee his or her "wages or compensation earned" at the time of separation no later than the employer's next regular payday. 43 Pa. Stat. Ann. § 260.5. The WPCL defines wages as "all earnings of an employee, regardless of whether determined on time, task, piece, commission or other method of calculation." *Id.* § 260.2a. Wages also include fringe benefits provided by an employer. *Id.* The WPCL confers onto employees the ability to institute legal actions to collect wages payable to them by employers. *Id.* § 260.9a; *Deron v. SG Printing, Inc.,* No. Civ.A.11–1934, 2012 WL 1902577, at *5 (M.D. Pa. May 25, 2012).The WPCL does not create a right to compensation; it provides a statutory remedy when the employer breaches a contractual obligation to pay earned wages.[10] *De Asencio*

---

[9] Plaintiff's reliance on *Merrill v. Crothall-American, In*c., 606 A.2d 96 (Del. 1992) is misplaced. *Merrill* addresses the presumption of at-will employment and the implied covenant of good faith and fair dealing;
Delaware courts have identified four primary situations in which an employer's authority to terminate an employee is limited by the implied covenant of good faith and fair dealing. *Bailey v. City of Wilm*., 766 A.2d 477, 480 (Del. 2001).  Here, as Rice argues, the termination of plaintiff's employment *vis*. his at-will status,  governed by Pennsylvania law, and the allegation of a breach of the implied covenant of good faith and fair dealing under the Award Agreements, governed by Delaware law, are separate and distinct causes of action.  Counts V, VII and IX are not  bound by the holding in *Merrill*. Plaintiff appears to have conceded as much, not having addressed, or even sought leave to address, this argument in his sur-reply.
[10] Bonus payments are recoverable under the WPCL. See 43 Pa. Stat. § 260.2a; *Cappuccio v. Pfizer, Inc*., No. Civ.A.07–549, 2007 WL 2593704, at *5 (E.D. Pa. Aug. 31, 2007). The burden falls on Plaintiff, however, to prove that the bonus is "earned," i.e. that the right to the wage or bonus vested under the terms of employment. *Stebok v. Am. Gen. Life & Acc. Ins. Co*., 715 F. Supp. 711, 713 (W.D. Pa.1989), aff'd, 888 F.2d 1382 (1989). Where a bonus

*v. Tyson Foods, Inc.*, 342 F.3d 301, 309 (3d Cir. 2003) (citing *Antol v. Esposto*, 100 F.3d 1111, 1117 (3d Cir.1996)). The contract between the parties governs in determining whether specific wages are earned. *Id*.

Construing the FAC in the light most favorable to Plaintiff, and disregarding his conclusory allegations, Plaintiff has failed to state a claim he is entitled to any shares under the Award Agreements because said shared did not vest and were forfeited by the express terms therein, upon his termination.  Plaintiff cannot maintain a plausible WPCL claim without alleging facts that demonstrate the Defendant intended to obligate itself to pay him.  *McGough v. Broadwing Commc'ns, Inc*., 177 F.Supp.2d 289, 299 (D. N.J. 2001) (holding plaintiffs' "vague allegations" insufficient to state a claim for payment of stock options under the WPCL because, inter alia, plaintiffs did "not even provide the terms under which they were allegedly entitled to receive these stock options" and plaintiffs did "not allege facts supporting a claim that their performance entitled them to an award of stock options."); *compare Braun*, 24 A.3d at 956–58 (holding that hourly employees could recover monetary payments for rest breaks under the WPCL because employer had agreed to compensate employees "for break time at the applicable rate of pay" in employee handbook).

Defendant's motion is accordingly granted with respect to Count XI.

## Leave to Amend

As noted earlier, Rice  previously filed a Partial Motion to Dismiss (ECF No. 6), and on February 12, 2020, Plaintiff filed the First Amended Complaint ("FAC") (ECF No. 11), and thus the first Motion to Dismiss was terminated as moot.  (ECF No. 12).  Leave to amend will not be granted because this would be inequitable and futile.  Plaintiff is represented by counsel and has

---

or incentive requires that an employee be actually employed by the employer at the time the payment comes due, the employee has not earned that bonus or incentive. *See id.; Cappuccio*, 2007 WL 2593704, at *5.

been afforded an opportunity to amend previously with the benefit of Rice's legal arguments in its first motion.

## IV. Conclusion

For all of the foregoing reasons, Defendant's Partial Motion to Dismiss will be granted. An appropriate Order of Court will follow.

Date: June 16, 2021

s/Robert J. Colville
Robert J. Colville
United States District Judge

cc/ecf: All counsel of record